

# United States Bankruptcy Court
# for the District of Oregon

**Albert E. Radcliffe, Judge**      151 West Seventh Avenue, Suite 300     (541) 465-6802
Virginia H. Denney, Judicial Assistant     Post Office Box 1335     FAX: (541) 465-6899
Howard J. Newman, Law Clerk     Eugene, Oregon 97440

March 21, 2006

Mr. Barry P. Caplan
Sussman Shank, LLP
1000 S. W. Broadway, Suite 1400
Portland, OR 97205-3089

Mr. Paul B. George
601 S. W. 2nd Avenue, #1800
Portland, OR 97204-3171

RE:    TROUTMAN INVESTMENT COMPANY; Case No. 02-69650-aer11
        Official Committee of Unsecured Creditors of Troutman Investment Co. v.
        Alamo Group, Inc., LLC, et al.; Adversary Proceeding No. 04-6242-aer
        Plaintiff's Motion for summary Judgment

Counsel:

      This letter is intended to announce my findings of fact and conclusions of law on the above referenced motion. Plaintiff has brought this adversary for breach of the Designation Rights Agreement (DRA). Defendants have answered, denying the material allegations, counterclaiming for damages for breach of the agreement, and for reformation. Plaintiff has now moved for summary judgment on its claims and on Defendants' counterclaims.

### Facts:

      On or about March 10, 2003, Debtor and Defendant, Alamo Group LLC, (Alamo) entered into the DRA whereby Debtor agreed to transfer certain of its rights and obligations (designation rights) under 24 leaseholds to Alamo. The DRA was approved by Order entered March 21, 2003.

      On or about April 30, 2003, Alamo and Defendants AOS Investors (AOS), LLC and Alamo Group VII, LLC (A VII) entered into an "Assignment and Assumption Agreement" whereby (I) Alamo assigned to AOS and AVII all right, title and interest to the DRA and Approval Order and (ii) AOS and AVII assumed all duties and obligations under the DRA and Approval Order. The Debtor signed the Assignment Agreement acknowledging its consent thereto providing, however, "but in no event shall that consent constitute a release of Alamo."

The DRA provided for the designation rights to be transferred to Alamo, in exchange for the purchase price of $2,105,000.00 plus (I) rejection damages exceeding the agreed upon Rejection Damage Cap and (ii) Recurring Carrying Costs.

Paragraph 19(a) of the DRA provides that except to the extent governed by the Bankruptcy Code, the Agreement shall be governed by Oregon law. Paragraph 19(b) is a standard integration clause, providing that the DRA (including its exhibits) supercedes any other agreement whether written or oral, and that the DRA (together with the exhibits thereto) constitutes the entire agreement between the parties, and there are no agreements or commitments by the parties except as expressly set forth therein.

**Summary Judgment Standards**:

On a motion for summary judgment, the moving party has the burden to establish the absence of a material issue of fact for trial. FRCP 56(c). The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Service., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Material facts are such facts as may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,248, 106 S.Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

With regard to its own claims or defenses, (i.e. those elements for which the moving party bears the burden of proof at trial) the movant must support its motion with evidence-using any of the materials specified in Rule 56(c)-that would entitle it to a directed verdict if not controverted at trial. Celotex Corporation v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2557, 91 L. Ed. 265 (1986)(Brennan, J)(dissent). There must be more than a "scintilla", indeed the evidence must be "significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). If the movant makes the requisite affirmative showing, the burden of production shifts to the non-moving party to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial, (i.e. significant probative evidence tending to support its claim or defense). Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.1991) (citation omitted)).

With regard to a motion for summary judgment <u>attacking</u> the opposing party's claims or defenses (i.e. those for which the <u>nonmovant</u> has the burden of proof at trial), and assuming sufficient time for discovery, the movant may discharge his Rule 56 burden in two ways. He may submit evidence affirmatively negating elements of the nonmoving parties' claims or defenses (method one) or, he may affirmatively demonstrate (other than by a conclusory statement) that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim, (method two), Celotex, supra at 2557 (Brennan dissent), as there is "no express or implied requirement... that the moving party support its motion with affidavits or other similar material negating the opponent's claim." Id. at 2553. (majority opinion).

Once the moving party has met its burden of production under either method,[1] the directed verdict standard once again comes into play, as the burden shifts to the nonmoving party to produce evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial. Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995) (quoting Celotex). This again requires the nonmoving party to produce significant probative evidence. Anderson, supra (a dispute with regard to a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).

All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Simone v. Manning, 930 F. Supp. 1434 (D. Or. 1996). When different ultimate inferences can be reached, summary judgment is not appropriate. Id.

Questions of motive and intent are generally not appropriate for disposition on summary judgment. Fantasy, Inc. v. Fogerty, 984 F.2d 1524 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994). Further, summary judgment is not appropriate where credibility is at issue. Neveau v. Boise Cascade Corp., 902 F. Supp. 207 (D. Or. 1995); Rebel Oil v. Atlantic Richfield Co., 51 F.3d 1421,1435 (9th Cir. 1995).

**Discussion:**

Lease Rejection Issues

Plaintiff argues Defendants are liable to pay or reimburse Debtor for lease rejection damages incurred as the result of lease rejection claims above $2,000,000. Defendants argue they must only start reimbursing after $2,000,000 in allowed lease rejection claims are actually paid.

Paragraph 3(c) of the DRA provides in pertinent part:

> Seller [Debtor] is responsible for the payment of any and all
> distributions paid or to be paid in respect of allowed claims arising
> out of or related to the rejection of Leases ("Rejection Damages")
> up to $2,000,000.00 in allowed claims (the "Rejection Damages
> Cap") and Buyer [Alamo] is responsible for and shall pay or
> reimburse Seller for all Rejection Damages paid or to be paid by
> Seller in excess of the Rejection Damages Cap....

The DRA provides that Oregon law will control. The DRA is a contract.

Over the recent past, there has been much discussion in the caselaw as to whether a court may go beyond the four corners of a contract and consider extrinsic evidence to determine if a

---

[1] If the moving party attempts to use method two, the nonmoving party may also call the court's attention to evidence already in the record that the movant has overlooked or ignored. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking the entire record allegedly supporting the nonmoving party that a moving party satisfies Rule 56 burden of production. Celotex, supra at 2557.(Brennan dissent).

contract term is ambiguous (i.e. whether the term reasonably can, in context, be given more than one meaning).  Very recently in <u>Batzer Const., Inc. v. Boyer</u>, __ Or. App. __, __ P.3d __, 2006 WL 336184 (2006), the Oregon Court of Appeals harmonized the two leading cases on the issue, <u>Yogman v. Parrott</u>, 325 Or. 358,  937 P.2d 1019 (1997) and <u>Abercrombie v. Hayden Corp</u>., 320 Or. 279, 282, 883 P.2d 845 (1994).  The <u>Boyer</u> court held squarely that pursuant to ORS 41.740 [2] and 42.220,[3] the court may consider extrinsic evidence to determine if an ambiguity exists, but that evidence may only consist of the circumstances under which the agreement was made, including the parties' prior course of dealings, pre-contract negotiations, and pre-contract admissions and statements.

      Here, even if I find ¶ 3(c)'s text unambiguous, examining evidence of the circumstances surrounding the formation of the DRA, as <u>Boyer</u> allows, (and giving Alamo all reasonable inferences), there are issues of fact as to whether "allowed claims" or "allowed claims <u>paid</u>" is the baseline.[4]  Mr. Gaube's affidavit plus Ex. 1 thereto indicates that the rejection cap was first put to pen in a "term" sheet, and that on January 23, 2003, Mr. Gaube edited the sheet to insert the phrase "actually incurred" to modify rejection damages.  The affidavit also relates that the present verbiage wasn't included in the DRA's initial drafts, but 0was inserted by Plaintiff's counsel, Mr. Indyke, in the final draft.  Mr. Indyke's affidavit confirms this.  Mr. Gaube's affidavit disputes that this final verbiage was ever discussed beforehand.

---

[2] ORS 41.740 provides:

> When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute.  However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud.  The term "agreement" includes deeds and wills as well as contracts between parties.

[3] ORS 42.220 provides:

> In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting.

[4] While the court determines whether a contract is ambiguous as a matter of law, examination of extrinsic evidence in that process necessitates fact finding. <u>Boyer</u>, <u>supra</u>.

Reformation:

In counterclaim #2, Alamo seeks reformation of ¶ 3(c) to reflect the parties' true agreement that Alamo is only liable for claims paid above $2,000,000.

> The province of reformation is to make a writing express the agreement that the parties intended it should. [R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression--one that relates to the content or effect of the writing that is intended to express their agreement--and the appropriate remedy is reformation of that writing properly to reflect their agreement.

Pioneer Resources, LLC v. D.R. Johnson Lumber Co., 187 Or.App. 341, 370, 68 P.3d 233, 250 (2003) (internal quotations and citations omitted).

In general, a party seeking reformation of a contract has the burden to establish the following elements by clear and convincing evidence: (1) there was an antecedent agreement (that was omitted from the final contract), to which the contract can be reformed; (2) there was a mutual mistake, or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) the party seeking reformation was not guilty of gross negligence. Aero Sales, Inc. v. City of Salem, 200 Or.App. 194, 114 P.3d 510 (2005). It is axiomatic that extrinsic evidence may be adduced to prove the parties' antecedent agreement.

As to the first element, for the same reasons as referenced above discussing ¶ 3)(c)'s ambiguity, Mr. Gaube's affidavit plus Ex. 1 thereto, creates a material issue of fact as to whether an antecedent agreement existed that conforms to Alamo's understanding.

As to the second element, the parties agree there was not a mutual mistake. Instead, Alamo argues it made a unilateral mistake, which was accompanied by Plaintiff's inequitable conduct.

> '[I]nequitable conduct' necessarily focuses on defendant's actions--and certain inactions--in the totality of the circumstances ....That inquiry is, frankly, somewhat impressionistic. As with 'gross negligence,' there is no omnibus standard by which we can definitively determine whether a contracting party's behavior constitutes 'inequitable conduct.' Rather, the range of misconduct termed 'inequitable' is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as 'overreaching' or 'sharp practice.'
>
> Still, a few general principles afford some guidance. First, a party's explicit or implicit misrepresentation about a material term

> of a written agreement can constitute inequitable conduct...That principle encompasses not only express misrepresentations but also circumstances in which one party knows that the other party is materially mistaken as to a writing's scope and effect, but remains silent, hoping to take advantage of the other's mistake...Comment e to section 161 of the Restatement expresses a closely related principle: One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds for reformation.

Pioneer Resources, supra at 375-76, 68 P.3d at 252-53 (internal citations and quotations omitted).

Here, Mr. Gaube's affidavit is enough to create an issue of fact as to whether a unilateral mistake was made and whether Plaintiff acted inequitably. As noted above, inequitable conduct can stop short of fraud.

As to the third element:

> The term 'gross negligence,' at least as it is used in the reformation context, is not well defined in the case law. Certainly, not all inattentive conduct by a party seeking reformation will bar equitable relief. Rather, conduct, in order to bar reformation, must go beyond mere oversight, inadvertence, or mistake and, instead, must amount to a degree of inattention that is inexcusable under the circumstances. The inquiry is necessarily fact-specific. In other words, 'gross negligence,' far from being a static concept subject to mechanical application, is one that requires careful consideration of the facts to determine if the party seeking reformation is, both in light of his or her own actions and as a matter of equity, entitled to such relief.

Id. at 373, 68 P.3d at 251 (quoting, Gibbons v. Foster, 177 Or. App. 45 ,54, 33 P.3d 329, __).

> [A] party's negligence in failing to read the writing does not [by itself] preclude reformation if the writing does not correctly express the prior agreement.
>
> The question, then, is whether a party's failure to detect the objectionable material in a particular case amount[s] to a degree of inattention that is inexcusable under the circumstances, where such circumstances include the existence of previous agreements between the parties relating to the same transaction. The

> significance of the existence of an antecedent agreement is closely connected to the concept of reliance. When two parties have an agreement that antedates their written agreement but relates to the same basic transaction, that previous agreement and the shared understandings with respect to that agreement help shape the parties' expectations as to the later written agreement. As a result, oversight in failing to read documents that might correct a party's mistaken understanding of some aspect of the transaction may, rather than constituting gross negligence precluding reformation, be excusable neglect, arising from the party's reliance on the terms as expressed in the previous agreement between the parties.

Id. at 373-74, 68 P.3d 233, 251-52 (internal citations and quotations omitted).

The concepts of inequitable conduct and gross negligence are related. "For example, the fact that one party engaged in a course of conduct calculated to conceal and perpetuate the other's mistake necessarily informs our determination of whether the second party's failure to discover its mistake was grossly negligent--or even negligent at all." Id. at 382, 68 P.3d at 256.

Again, I believe Mr. Gaube's affidavit creates a material issue of fact as to Alamo's lack of gross negligence. Contrary to Plaintiff's argument, as Pioneer Resources makes clear, failure to read the DRA's final version (or catch the non-conforming language), is not per se, gross negligence.

Exhibit E Issues:

Exhibit E to the DRA (see Defendant's Ex. Q) is entitled "Alamo Bid, Lease Rejection Claims Summary." It itemizes the 24 leases Alamo bid on and the items of damages that could go into a rejection claim for each lease. The last column is entitled "Final Maximum Lease Rejection Claim bef. Mitigation (Prelim-2/3/03)." The exhibit has a footnote as follows: "Total Rejection Claims exclude Cure Amounts and are calculated based on available property tax and CAM updates received from Landlords through Feb. 14, 2003".[5]

Paragraph 3(c) does not reference Exhibit E to define a ceiling for "allowed claims." Exhibit E's only reference in the DRA is in ¶18(b). Paragraph 18(a) requires Alamo to post a letter of credit at closing to secure certain "deferred obligations", one of which is to pay rejection

---

[5] Paragraph 19(l) of the DRA provides that "[a]ll exhibits attached and referred to in this Agreement are hereby incorporated herein as fully set forth in (and shall be deemed a party [sic] of) this Agreement."

damages. Paragraph 18(b) requires the amount of the initial letter of credit be $2,000,000. The paragraph then allows the letter of credit to be reduced upon Debtor's agreement to the lesser of:

> (A) the sum of the potential maximum Rejection Damages for each Lease as set forth on Exhibit E hereto with respect to each lease that has not been assumed by Buyer or Buyer's designees, less the Rejection Damages Cap and less any Rejection Damages previously paid by Buyer to Seller, and (B) $2,000,000 (the "Letter of Credit Amount.")

Defendants argue Exhibit E's figures for maximum rejection claims caps those claims (subject to adjustment as set forth in the Exhibit), and that some of the rejection claims now asserted by Debtor exceed that cap. Plaintiffs argue no such ceiling exists, that the "maximum" totals were merely preliminary, and because the rejection claims themselves have been liquidated (either through settlement or litigation) and have been reduced to court order (see Plaintiff's Ex. U), which Defendants got notice of, Defendants are now barred by the preclusive effect of these orders from re-litigating the amount of the rejection claims.

This last argument is akin to one based on law of the case or res judicata. Plaintiff would have the burden of proof at trial, so must come forward on summary judgment. However, Plaintiff has adduced no proof (only bare argument) that Defendants got notice of the proceedings whereby the various rejection claims orders were entered. I have no duty to independently search the record. Further, per Ex. U, for at least two leases, Oregon City and John Day, Defendants specifically reserved their right to object to the rejection claim within the context of liability under the DRA.

As to whether Exhibit E sets a ceiling per the DRA, ¶ 3(c) does not reference Exhibit E. Rather Exhibit E reflects how much security (by way of letter of credit) Debtor may agree to. One could reasonably infer, however, that the intent would be to keep Debtor fully secured. If so, and the Exhibit E amounts are all that are necessary to keep Debtor fully secured, one could reasonably infer the parties intended that Exhibit E's "maximum" figures (as adjusted by the calculation referred to therein) set a cap.

Further, pursuant to <u>Boyer</u>, the evidence adduced surrounding the DRA's formation, in particular Mr. Gaube's affidavit at ¶ 7 which discusses attaching a schedule to determine maximum rejection claims, is sufficient to create a factual issue, as I must not weigh evidence or judge credibility on summary judgment.

Chico claim:

Exhibit U notes the Chico Mall rejection claim has been allowed at $541,812.22. Defendants have adduced evidence that Chico agreed to assign this claim to Defendants (and thereby extinguish it) should the rejection claims exceed the $2,000,000 cap, see Ex. 4 to Mr. Gaube's affidavit. See Plaintiff's Ex. U. Exhibit. 4 to the Mr. Gaube affidavit is an e-mail from Chico to Alamo confirming that Alamo agrees to accept $1.00 for the termination of the lease, and agrees to pay a fee of $2/sq ft to Alamo if Alamo is the agent who finds Chico a new tenant. Defendants contend this at least raises an issue of fact as to whether the Chico Mall claim should be calculated. Plaintiffs argue that no factual issue exists because Defendant's side deal was a breach of the DRA, noting ¶ 3(a) thereof which provides:

> Buyer shall not be entitled to direct Seller to reject any Lease if
> Buyer receives any consideration whatsoever in connection with
> that Lease.

At the least, there is an issue of fact as to whether the proper damages for any purported breach is to count the full rejection claim in the "cap" computation. Under ¶ 3(a), by accepting consideration, Alamo was not entitled to direct Debtor to reject the Chico Mall lease. However, there is no evidence in the record as to whether Debtor, <u>even absent instruction from Alamo</u>, would have rejected the lease. If so, presumably, the assignment would stand,[6] and the rejection claim would be extinguished.

Recurring Carrying Costs (RCCs) Issues:

Alamo contends its RCCs are limited to only those categories on Exhibit B. Plaintiff argues there is no such limitation.

Paragraph 3(d) of the DRA provides in pertinent part:

> Except as otherwise provided, Buyer shall reimburse Seller for all
> Recurring Carrying Costs accruing under a lease during and
> allocable to the period (the "Accrual Period") commencing on the
> later of (a) May 1, 2003, or (b) completion of a going out of
> business sale, if any, on the Premises, and continuing until the
> earliest to occur of (I) the assumption and assignment of such lease
> to a third party, (ii) the effective date of rejection of any such
> Lease, (iii) ten (10) days after Buyer notifies Seller in writing to

---

[6] Plaintiffs concede that Alamo's violation of the DRA is without prejudice to the validity of the agreement between Alamo and Chico Mall.

reject such lease, (iv) the termination of the Agreement (without
initiation of Seller's right to claim damages in the event this
Agreement is terminated due to Buyer's default) or (v) the date
such lease becomes an Excluded Lease.

Paragraph 3(e) defines "Recurring Carrying Costs." Per ¶ 19(i)(A),[7] I must insert the words, "without limitation" after the term "including", so the paragraph reads as follows:

"Recurring Carrying Costs" shall mean those per diem costs and
expenses with respect to each Lease, including [without limitation]
rent, common area maintenance, insurance, property taxes and
other charges, along with regularly scheduled increases in such
amounts and adjustments made to such amounts in accordance
with the Leases, all as described in Exhibit B attached, provided
the same accrue during the Accrual Period.

Exhibit B (See Plaintiff's Exhibit Q), to the DRA lists 5 types of RCCs for each of the 24 leases subject to the DRA: 1) rent, 2) CAM charges; 3) Merchants' Association fees; 4) real property taxes; and 5) insurance.[8]

Both parties argue ¶ 3(e) unambiguously supports their respective positions. Paragraph 3(e) qualifies the list of applicable charges with "<u>all</u> as described in Exhibit B." This could lead to a reasonable conclusion that Exhibit B sets the parameters. However, Exhibit B itself is self-limiting; it only list 5 categories of charges, with no others possible. If the parties wanted to limit the categories to those in Exhibit B, they would not have needed the "including [without limitation] rent, common area maintenance...etc." clause. There is at least an inference the parties did not intend surplusage. As such, I find the text ambiguous.

---

[7] Paragraph 19(i)(A) of the DRA provides:

Whenever the words "including", "include" or "includes" are used in this
Agreement, they should be interpreted in a non-exclusive manner as
though the words, "without limitation" immediately following [sic] the
same.

[8] At the head of the "Total" column, there is a reference to footnote #1 which adds "insurance" as an RCC as follows:

Subject to reconciliation re: current property tax, <u>insurance</u>, CAM
updates received from landlords after Feb. 11, 2003.(emphasis added).

In the alternative, if I examine evidence of the circumstances surrounding the DRA's formation, both parties have presented sufficient extrinsic evidence to support their respective positions, and summary judgment should be denied.

Reformation:

Defendants have also counterclaimed to reform the DRA to conform to an antecedent agreement that Exhibit B limits the types of RCCs. The same extrinsic evidence as to ambiguity, supports an issue of fact on the reformation claim.

Counterclaim for $95,048:

Defendants have counterclaimed for $95,048 representing alleged overpayments under the DRA. Plaintiffs have moved for summary judgment in their favor on this claim. The evidentiary materials indicate the claim is broken up into: 1) $36,296 as a 4 month rental overpayment on the Pony Mall, North Bend lease, and 2) $58,752 as an 8 month rental overpayment on the Nampa lease.

As to the Pony Mall lease, the overpayments allegedly were the result of an agreement between the landlord and Defendants, to reduce the rent by half. Plaintiffs however, have adduced evidence that this agreement never became effective, because it was conditioned on assumption of the lease, see e-mail from landlord Pendergrass to Schiff-Ex. 10 to Plaintiff's Ex. J, and the lease was in fact rejected. However, Plaintiff's own Exhibit J, which is an excerpt of Mr. Gaube's deposition, at pp. 172-174, indicates that this condition was not part of the deal, and that Mr. Gaube had never seen the Pendergrass/Schiff e-mail. This is enough to create an issue of fact and deny summary judgment.

As to the Nampa lease, Plaintiffs concede Defendants overpaid Debtor $66,644. As such, Defendants has established a counterclaim in this amount, with final judgment thereon (and any setoff thereof) to await the conclusion of these proceedings.

Conclusion:

With the exception of the counterclaim regarding the Nampa lease, there are genuine issues of material fact as to the claims and counterclaims in this case, and as such, summary judgment will be denied.

Very truly yours,

*albert E. radcliffe*

ALBERT E. RADCLIFFE
Bankruptcy Judge

AER:vhd